UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:21-cv-41-KCD

LAS BRISAS CONDOMINIUM
HOMES CONDOMINIUM
ASSOCIATION, INC.,

    Plaintiff,
v.

EMPIRE INDEMNITY INSURANCE
COMPANY,

    Defendant.
_____/

**PLAINTIFF'S MOTION TO OVERRULE DEFENDANT'S OBJECTIONS TO PLAINTIFF'S SIXTH REQUESTS FOR PRODUCTION, AND COMPEL BETTER RESPONSES**

Plaintiff, LAS BRISAS CONDOMINIUM HOMES CONDOMINIUM ASSOCIATION, INC. ("Plaintiff"), by and through the undersigned counsel hereby files this Motion to Overrule Defendant's, Empire Indemnity Insurance Company ("Defendant"), Objections to Plaintiff's Sixth Requests for Production, and Compel Better Responses, and in support thereof states as follows:

**I.    BACKGROUND**

1.    On or about December 21, 2020, Plaintiff filed a Complaint for *Bad Faith* against Defendant alleging various statutory violations related to a claim for damages to real property reported under and through a contract of insurance with Defendant. This Complaint was filed in Lee County Circuit Civil State Court under case number 20-CA-008541, but later removed by Defendant to this Court.

2. During the course of litigation, Plaintiff's counsel engaged in research regarding Defendant's reinsurance policies, procedures, and agreements when Plaintiff came across a public filing from "ELANY', which is attached hereto as *Exhibit "A."*

3. On or about March 15, 2023, Plaintiff propounded tailored, written discovery on Defendant based on the ELANY filing via a Sixth Request for Production. *Plaintiff's Sixth Request for Production to Defendant is attached hereto as Composite Exhibit "B".* Thereafter, on April 14, 2023, Defendant responded to the aforementioned discovery requests. *Defendant's responses to Plaintiff's Sixth Request for Production are attached hereto as Composite Exhibit "C".*

4. In sum, Defendant objects to the various requests using the same, boilerplate and/or form to each. *See generally Composite Exhibit "B".*

5. The main contention, as Plaintiff can understand, is that the requests are "[i]rrelevant, overly broad, immaterial, and not reasonably calculated to lead to admissible evidence." Defendant also makes reference to objections regarding "trade secrets or information that are proprietary, confidential, or commercially sensitive" as well as asserting a non-waiver to "trade secrets, work product, attorney-client, or confidentiality." *See generally Composite Exhibit "B".*

6. Defendant provides no further insight into the justification of the raised objections; specifically, avoiding additional information regarding the latter assertions.

7. The requests made in the above written discovery focus directly on procuring evidence for Plaintiff's claim of Bad Faith against Defendant.

## II.    ARGUMENT

Rule 26(b) (1), Federal Rules of Civil Procedure, sets forth the general scope of discovery. It instructs that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed.R.Civ.P. 26(b)(1). Plaintiff has filed an action for bad faith against Defendant with an additional claim for punitive damages.

Accordingly, "[t]he Federal Rules of Civil Procedure strongly favor full discovery whenever possible," *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir.1985).

And the requests here are specific, narrowly tailored requests aimed at gathering information relative to Defendant's reinsurance and reserve setting, as well as other metrics used to analyze bad faith claim practices prevalent within Defendant's company, which are discoverable in a bad faith action such as this one. *See Pepperwood of Naples Condo. Ass'n, Inc. v. Nationwide Mut. Fire Ins. Co.*, No. 2:10-CV-753-FTM-36, 2011 WL 4596060, at *13 (M.D. Fla. Oct. 3, 2011) (finding information on insurance reserves relevant and discoverable in a bad faith case); *Seacoast 5151 Condo. Ass'n v. Great Am. Ins. Co. of New York*, No. 17-23820-CIV, 2018 WL 6653342, at *4 (S.D. Fla. Sept. 21, 2018), report and recommendation adopted, 2018 WL 6653071 (S.D. Fla. Nov. 6, 2018) ("[T]he undersigned agrees with [defendant] that reserve information is generally not discoverable in insurance coverage cases absent an allegation of bad faith by the insured.").

While federal district courts are split on the issue, this position has growing support of disclosure of such discovery. *See, e.g., Mirarchi v. Senaca Specialty Ins. Co.*, 564

3

Fed. Appx. 652 (3d Cir. 2014) ("[reserve] information is sometimes relevant in bad faith cases."); *Park-Ohio Holdings Corp. v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5055947, at *4 (N.D. Ohio Aug. 25, 2015) ("Information about the levels of reserve that insurance companies set aside for individual claims is relevant as information about [d]efendant's valuation of the claims and could demonstrate a lack of good faith regarding settling the claim."); *Bernstein v. Travelers Ins. Co.*, 447 F. Supp.2d 1100, 1107 (N.D. Cal. 2006) (in some circumstances, reserves may be relevant to the insurer's subjective state of mind in bad faith cases); *but see Bondex Int'l, Inc. v. Hartford Acc. & Indem. Co.*, 2006 WL 355289, at *2 (N.D. Ohio Feb. 15, 2006) (Reserves "do not normally entail an evaluation of coverage based upon a thorough factually and legal consideration when routinely made as a claim analysis.").

The determination of whether loss reserves are relevant depends on the circumstances of the case. Where such information is "relevant to show the insurer's state of mind in relation to its claim settlement practices," it is discoverable and must be turned over. *McCray v. Allstate Ins. Co.*, 2015 WL 6408048, at *6 (D.S.C. Oct. 22, 2015) (quotation omitted).

Regarding reinsurance information, generally discovery into reinsurance coverage in insurance coverage disputes between an insured and its insurer is prohibited. *See, e.g., Medmarc Casualty Ins. Co. v. Arrow Int'l, Inc.*, 2002 WL 1870452 (E.D. Pa. July 29, 2002); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 117 F.R.D. 283, 288 (D.D.C. 1986). However, these cases acknowledge that there may be other types of situations where reinsurance coverage may be deemed relevant for discovery purposes and that

4

there is no per se rule that prohibits any discovery into reinsurance policies. *Medmarc*, 2002 WL 1870452 at *4.

Bad faith litigation, such Plaintiff's action here, presents such an instance where the need arises to inquire into an insurance carrier's reinsurance coverage. *See, e.g., Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 152 F.R.D. 132, 142 (N.D. Ill. 1993); *Clark v. Interstate Nat'l Corp.*, 486 F.Supp. 145, 146 (E.D. Pa. 1980); *Fireman's Fund Ins. Co. v. Superior Court*, 233 Cal.App.3d 1138, 286 Cal.Rptr. 50 (Cal. Ct. App. 1991); *Lipton v. Superior Court*, 48 Cal.App.4th 1599, 56 Cal.Rptr.2d 341 (Cal. Ct. App. 1996).

The document requests at issue in this motion, limited from 2015 through 2019, go directly to evidence supporting Plaintiff's contention that bad faith conduct present in Plaintiff's claim was prevailing and general business practice of Defendant. Specifically, Plaintiff provides the following analysis of the relevancy of each request:

- *Reinsurance pooling agreements* involve multiple insurance carriers sharing the risk of loss through the pool. Plaintiff seeks to understanding the relationship between Defendant and the reinsurance pool implicating bad faith behavior, such as unjustly denying claims or delaying payments to protect the pool's financial interests. These actions are part of the allegations raised in Plaintiff's action.

- *Pooling ratios and premium allocation* influence the incentives and risk exposure of the participating carriers. Examining these factors will provide insight into Defendant's motivations and potential bad faith behavior, as carriers with higher risk exposure or more significant financial contributions are more inclined to engage in unfair claims handling practices to protect their interests.

5

- An assessment of *profit distribution* allows Plaintiff to determine if profit distribution is heavily tied to claims performance. In which case, Defendant is incentivized to engage in bad faith actions to maximize their share of the pool's profits.

- *Loss sharing provisions*, like profit distributions above, determine how losses are shared among the participants in a reinsurance pool. This information can reveal if Defendant has incentives to deny or delay claims to minimize its share of losses. Allegations at the heart of Plaintiff's bad faith action.

- *Reinsurance treaties* are, typically, agreements that cover a predefined portfolio of risks, while *facultative certificates* are issued for individual risks. Analyzing Defendant's mix of reinsurance treaties and facultative certificates will determine if they are selectively reinsuring specific risks or using reinsurance as a mechanism to engage in bad faith practices such as when an insurance carrier offloads excessive risk through reinsurance without proper disclosure or risk assessment, it leads to inadequate coverage for the policyholder resulting in incentive to underpay and delay claims.

- Analyzing *claims and loss data* reveals patterns, trends, or more to the point "general business practices" of the Defendant, such as consistently high denial rates, unusually long processing times, or inadequate investigation of claims provides evidence of Defendant's bad faith conduct as alleged by Plaintiff.

- Defendant's *financial statements and reports* provide evidence of Defendant's financial stability, risk appetite, and ability to fulfill its claims obligations.

- Evaluating *correspondence and meeting records* regarding reinsurance can help identify any incentives the carrier may have to deny or delay claims to minimize its share of losses or maximize profits.  Incentivization at the reinsurance level would be evidence of a companywide business practice.

- *Exposure reports* detail Defendant's potential liabilities and risks associated with their insurance portfolio. Evaluating these reports can help identify Defendant's risk appetite and understand their approach to managing potential losses. A carrier that is overly concerned with limiting exposure has an incentive to engage in bad faith practices to minimize claims payouts.  Loss exposure reports to reinsurers and pool affiliates are a very important area to cross reference with information being conveyed to policyholders, claimants, and their representatives.

- *Aggregate pool exposure reports*, like the exposure reports referenced above, provide an overview of Defendant's potential liabilities and risks associated with their participation in reinsurance pools. Evaluating these reports again, identifies Defendant's risk appetite and provides understanding to their approach in managing potential losses. A carrier that is overly concerned with limiting exposure has an incentive to engage in bad faith practices in minimizing/delaying claims payouts as has been alleged by Plaintiff.  Again, loss exposure reports to reinsurers and pool affiliates are a very important area to cross reference with information being conveyed to policyholders, claimants, and their representatives.

- *Financial data exchanges* between carriers, reinsurers, and regulators provide insights into the carrier's financial position, risk exposure, and claims handling

7

practices. Transparency in financial data exchanges would indicate Defendant's commitment to fair business practices and ethical conduct. However, as noted above, financially unstable carriers are motivated to engage in bad faith practices to protect their financial position. Yet again, loss exposure reports to reinsurers and pool affiliates are a very important area to cross reference with information being conveyed to policyholders, claimants, and their representatives.

- *Affiliate transactions* between Defendant and related entities can create potential conflicts of interest, which would impact claims handling behavior. Analyzing affiliate transactions can reveal financial incentives that may encourage Defendant to engage in bad faith practices to benefit affiliated companies or stakeholders.

- *Risk modeling and analytics* are typically tools for carriers to assess potential risks and develop strategies to manage them. Examining the carrier's risk models can help identify biases, inaccuracies, or inconsistencies that may contribute to bad faith practices permeating into general business practices. Further, analyzing Defendant's risk modeling and analytics allows for an assessment of their claims management processes, including how they assess claim values and allocate resources for claims handling. Manipulated, inaccurate, or biased risk models is evidence of unfair claims handling practices and bad faith actions.

- Assessing Defendant's *capital adequacy and solvency* goes, again, to Defendant's financial stability and ability to fulfill their claims obligations. Carriers with inadequate capital or solvency are motivated to engage in bad faith practices to protect their financial position.

- Insurance carriers must adhere to various regulatory requirements and industry standards. Examining Defendant's *regulatory and compliance documentation* allows Plaintiff to evaluated Defendant's overall commitment to fair and ethical business practices (general business practices). A history of regulatory violations or non-compliance suggests a pattern of bad faith behavior, further evidence of ingrained policies and procedures. Regulatory and compliance documentation would also reveal Defendant's adherence to industry best practices for claims handling, underwriting, and risk management. Deviations from these practices is evidence of bad faith actions.

- Prompt and efficient handling of claims is a key aspect of good faith. Delays in processing claims indicate bad faith behavior, especially when the carrier takes an unreasonable amount of time to process claims without proper justification. Therefore, assessing Defendant's *claims processing efficiency* would reveal inconsistencies in their handling of similar claims. Inconsistencies or discrepancies show that Defendant is treating certain claimants, like Plaintiff and those already identified in Plaintiff's Complaint, unfairly. Analyzing efficiency in processing claims allows for a determination of patterns evidencing a general business practice. Further, insurance carriers must conduct reasonable investigations to establish the validity of claims. By examining claims processing efficiency, one can evaluate whether Defendant conducted proper investigations in a timely manner or engaged in unnecessarily lengthy or intrusive investigations to delay payment or deny a claim, as alleged by Plaintiff.

- Scrutinizing Defendant's *claim approval and denial rates* provides insight into their overall claims handling practices. A high denial rate or a pattern of denials for specific types of claims provides evidence of bad faith conduct toward insureds.

- The *claims loss ratio* represents the percentage of premiums paid out as claims by the insurance carrier. A significantly low loss ratio compared to industry averages or similar carriers suggests that a carrier is denying claims more frequently or paying out less than they should, which evidence of, not only bad faith behavior, but of a general business practice.

- *Customer satisfaction metrics*, such as complaint ratios, ratings, or reviews, are indicative of Defendant's overall performance and claims handling practices from the perspective of the insured(s). A high number of complaints or negative feedback related to claim handling, delays, denials, or communication issues is evidence of bad faith actions by the insurance carrier.

- Assessing *claims handling expenses* offers insight into the efficiency and effectiveness of Defendant's claims operations. High expenses, compared to industry averages or similar carriers, are evidence of operational inefficiencies, leading to delays or mishandling of claims. Conversely, exceptionally low expenses indicate inadequate resources dedicated to claims handling.

- Insurance carriers must take appropriate measures to detect and prevent fraud. Examining Defendant's *claim fraud detection* practices helps determine if Defendant is using fraud prevention as an excuse for unreasonable claim denials or delays. If the carrier's fraud detection measures disproportionately impact certain claimants

10

or result in a high rate of false positives, this would be evidence that these procedures are being used merely as a delay tactic, and not for its intended purpose.

- *Key Performance Indicators* or KPIs are used by insurance carriers to evaluate their performance in various areas, including claims handling. Assessing Defendant's KPIs can reveal whether their performance meets industry standards or if there are discrepancies in specific areas would indicate bad faith practices. Additionally, understanding how the carrier incentivizes or evaluates its employees based on KPIs can provide insights into potential systemic issues that may contribute to bad faith behavior.

- A carrier's *employee training and development* programs play a crucial role in ensuring that claims are handled fairly and efficiently. Examining these programs can help determine if Defendant provides adequate training, resources, and support to its employees, enabling them to perform their duties in good faith. Inadequate training or development would result in misunderstandings, mistakes, or mismanagement of claims.

- Reserves are funds set aside by insurance carriers to cover potential future claims payments. Examining Defendant's *claim reserving practices* (as stated above) can reveal if they are under- or over-reserving, which may impact their claims handling behavior. Specifically, under-reserving may lead to aggressive claim denials or delays to protect the carrier's financial position.

- Understanding Defendant's *goals and objectives* related to claims handling can help determine if they are aligned with industry best practices and regulatory requirements.  Goals and objectives focused on minimizing claims payouts or promoting aggressive cost containment incentivize bad faith actions.

- *Performance analysis reports* provide insights into Defendant's claims handling efficiency, effectiveness, and overall performance as would be assessed as a general business practice. Analyzing these reports would show patterns of behavior or systemic issues, such as consistently high denial rates, long processing times, or inadequate investigation of claims.

- *Exposure reports*, again, detail Defendant's potential liabilities and risks associated with their insurance portfolio. Evaluating these reports can help identify Defendant's risk appetite and understand their approach to managing potential losses. A carrier that is overly concerned with limiting exposure has reason to engage in bad faith practices to minimize claims payouts.

- The use of *technology and automation* in claims handling can influence an insurance carrier's efficiency and accuracy. If Defendant's technology and automation systems are outdated, use unreliable data, or allow insufficient resources to be allocated in claims processing, such information is evidence of bad faith structures within the company. Additionally, understanding whether Defendant relies on automated decision-making tools allows for an evaluation if these tools are contributing to unfair or biased claim denials or delays.

- Again, as stated above, insurance carriers must adhere to various regulatory requirements and industry standards. Examining Defendant's *compliance with these regulations* can provide insight into their overall commitment to fair and ethical business practices. A history of regulatory violations or non-compliance may suggest a pattern of bad faith behavior.

In touching on Defendant's assertion of potential confidentiality, trade secrets, and the like asserted in each response, those concerns can be remedied through a Consent Protective Agreement, one of which was entered into with Defendant in the sister case 2:21-cv-00105-KCD.

Defendant's objections/responses to Plaintiff's Sixth Request for Production are mere boilerplate as Defendant fails to provide any support for their contentions. Plaintiff, in this Motion, has demonstrated that, not only are the requests relevant to the issues in this case, but that disclosure of such information is supported by Florida and Federal law.

WHEREFORE, Plaintiff, LAS BRISAS CONDOMINIUM HOMES CONDOMINIUM ASSOCIATION, INC., hereby seek entry of an Order **(i)** granting this Motion, **(ii)** overruling Defendant's general objections as to Plaintiff's Sixth Requests Production **(iii)** compel better responses, and **(iv)** and for any other relief the Court deems just and proper.

**Local Rule 3.01(g) Certification**

Counsel for Plaintiff presented counsel for Defendant a copy of this motion via email on April 25, 2023 and followed up thereafter on April 27, 2023 and March 9, 2023. Counsel for Plaintiff takes the non-response indicative of disagreement.

## CERTIFICATE OF SERVICE

I Hereby Certify that on this 10th day of May, 2023, I caused a true and correct copy of the foregoing document to be served via email to all counsel of record on the attached service list.

*/s/Shaun J. Marker*
Shaun J. Marker, Esq.
Florida Bar No.:  0017378

## SERVICE LIST

**LAS BRISAS CONDOMINIUM HOMES CONDOMINIUM ASSOCIATION, INC.**

**v.**

**EMPIRE INDEMNITY INSURANCE COMPANY**

**CASE NO. 2:21-cv-41-KCD**
United States District Court, Middle District of Florida, Fort Myers Division

**J. Michael Grimley. Jr., Esq.**
**Edward Krakauer, Esq.**
Galloway, Johnson, Tompkins, Burr & Smith, PLC
118 East Garden Street
Pensacola, FL 32502
Telephone: 850-436-7000
Facsimile: 850-436-7099
Email: mgrimley@gallowaylawfirm.com
ekrakauer@gallowaylawfirm.com
jmgservice@gallowaylawfirm.com
**Via CM/ECF**